**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

MARITES M. BARROGO,

*Defendant-Appellant.*

No. 21-10228

D.C. No. 1:20-cr-00012-FMTG-1

OPINION

Appeal from the United States District Court
for the District of Guam
Frances Tydingco-Gatewood, Chief District Judge,
Presiding

Argued and Submitted October 13, 2022
Honolulu, Hawaii

Filed February 2, 2023

Before: Mary M. Schroeder, Johnnie B. Rawlinson, and
Daniel A. Bress, Circuit Judges.

Opinion by Judge Bress

# SUMMARY[*]

## Criminal Law

The panel affirmed a criminal judgment in a case in which the defendant pleaded guilty to conspiracy to use, transfer, acquire, alter or possess Supplemental Nutrition Assistance Program benefits without authorization, in violation of 7 U.S.C. § 2024 and 18 U.S.C. § 371.

Considering principally whether the district court properly imposed a two-level sentencing enhancement under U.S.S.G. § 2B1.1(b)(11)(A)(ii) for the defendant's misuse of an "authentication feature," the panel held that a personal identification number associated with a debit-type card is an "authentication feature" under the Sentencing Guidelines and the statutory provisions they reference.

The panel held that the defendant did not demonstrate error in the district court's order requiring her to pay $18,752.30 in restitution, and rejected the defendant's argument that the government's breach of the plea agreement constituted plain error.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Kathryn A. Young (argued), Deputy Federal Public Defender; Cuauhtemoc Ortega, Federal Public Defender, Federal Public Defender's Office, Los Angeles, California; for Defendant-Appellant.

Benjamin K. Petersburg (argued), Assistant United States Attorney; Shawn N. Anderson, United States Attorney, Office of the United States Attorney, Hagatna, Guam; for Plaintiff-Appellee.

**OPINION**

BRESS, Circuit Judge:

In this criminal case involving the unauthorized use of federal food stamp benefits, we principally consider whether the district court properly imposed a two-level sentencing enhancement for the defendant's misuse of an "authentication feature." U.S.S.G. § 2B1.1(b)(11)(A)(ii). We hold that a personal identification number (PIN) associated with a debit-type card is an "authentication feature" under the Sentencing Guidelines and the statutory provisions they reference. We also reject the defendant's other assignments of error and affirm her conviction and sentence.

I

The Supplemental Nutrition Assistance Program (SNAP), formerly known as the Food Stamp Program, is a federal program that "permit[s] low-income households to obtain a more nutritious diet through normal channels of

trade by increasing food purchasing power for all eligible households who apply for participation." 7 U.S.C. § 2011; *see also Hall v. U.S. Dep't of Agric.*, 984 F.3d 825, 831 (9th Cir. 2020) (describing the SNAP program). States and territories are provided funding to administer SNAP benefits. 7 U.S.C. § 2013(a).

In Guam, SNAP is administered through the Guam Department of Public Health and Social Services (DPHSS). DPHSS provides SNAP recipients with an Electronic Benefits Transfer (EBT) card, which is like a debit card that can be used at authorized stores to buy certain food products. Each EBT card has a card number imprinted on it. And each cardholder has a PIN that, like a debit card PIN, must be entered at the point of sale to complete the transaction.

Marites Barrogo, who was not a SNAP beneficiary, was the owner and operator of Laguna Best Restaurant and Catering in Harmon, Guam. From 2015 to 2020, Barrogo bought SNAP benefits from various individuals at a substantial discount, and then used those benefits to buy bulk food items for her restaurant.

Barrogo used two different methods to traffic SNAP benefits. From 2015 to 2018, Barrogo regularly purchased SNAP benefits from co-defendant Stephanie Muna. Approximately once a month, Muna would give Barrogo her EBT card and PIN and Barrogo would purchase bulk food items for Laguna Best. Barrogo would typically use $600 worth of SNAP benefits each month, for which she would pay Muna $400 in cash. During this period, Muna recruited at least four other SNAP beneficiaries to sell their benefits to Barrogo.

In June 2018, the DPHHS Investigation and Recovery Office began investigating Barrogo. When investigators

visited her restaurant and questioned her, Barrogo admitted that she had been paying Muna cash in exchange for SNAP benefits. Barrogo also provided investigators with a signed statement acknowledging her transactions with SNAP beneficiaries. Following this interview, DPHSS permanently disqualified Muna from receiving SNAP benefits. Muna's trafficked SNAP benefits ultimately totaled $15,625.

Notwithstanding the DPHSS investigation, Barrogo continued to traffic SNAP benefits with at least three other SNAP beneficiaries, except now using a more surreptitious method. Instead of using the EBT cards herself, she gave shopping lists to SNAP beneficiaries who then purchased food for the restaurant in exchange for cash.

In December 2019, the DPHSS Investigation and Recovery Office received a call from an informant who reported that two men were delivering food items to Laguna Best using their vehicle. The informant provided photos of the men, one of whom was later identified as A.M. Using video footage from stores, the investigators concluded that A.M. and his common law spouse, J.D., had been using their SNAP benefits to make two to three purchases per month of the same bulk food items, including large sacks of rice, boxes of frozen meats, vegetables, and a whole pig. These items were clearly not intended for personal household consumption. Between the video footage and the informant's photos of A.M. delivering bulk food items to Laguna Best, investigators were able to link these purchases to Barrogo.

Based on EBT card receipts reflecting suspected trafficked items, DPHSS concluded that A.M. and J.D. had provided a total of $21,317.67 in SNAP benefits to Barrogo

between 2018 and 2020. Following another anonymous tip, DPHSS identified a fourth individual, A.T., with whom Barrogo had trafficked another $561.53 in SNAP benefits. The informant reported that on November 4, 2019, A.T. delivered ten sacks of rice and five boxes of spareribs to Laguna Best.

A grand jury indicted Barrogo on two counts of the unauthorized use of SNAP benefits, in violation of 7 U.S.C. § 2024, and one count of conspiracy to use, transfer, acquire, alter or possess SNAP benefits without authorization, in violation of 7 U.S.C. § 2024 and 18 U.S.C. § 371. Barrogo pled guilty to the conspiracy count. As part of her plea agreement, Barrogo stipulated to a two-level authentication feature enhancement under U.S.S.G. § 2B1.1(b)(11)(A)(ii), which was based on her use of EBT cards and PINs to purchase food. The other two charges in the indictment were dismissed as part of the plea.

With a two-level increase for use of an authentication feature, the advisory Sentencing Guidelines range was 10–16 months in prison. The district court sentenced Barrogo to ten months' imprisonment and three years of supervised release. The court also ordered Barrogo to pay $18,752.30 in restitution. Barrogo timely appealed.

## II

We first address whether the district court properly applied the two-level authentication feature enhancement based on Barrogo's use of the SNAP beneficiaries' EBT cards and PINs. Generally, we review the district court's interpretation of the Sentencing Guidelines de novo. *United States v. Parlor*, 2 F.4th 807, 811 (9th Cir. 2021). Because Barrogo failed to object below, however, we review here for plain error. *United States v. Wang*, 944 F.3d 1081, 1085 (9th

Cir. 2019). Regardless, the outcome would be the same under any standard of review because the district court correctly applied the enhancement.[1]

U.S.S.G. § 2B1.1(b)(11)(A)(ii) provides for a two-level increase if the offense involved "the possession or use of any . . . authentication feature." Three layered statutory definitions are relevant to the proper interpretation of this enhancement. First, the Sentencing Guidelines incorporate the definition of "authentication feature" found in 18 U.S.C. § 1028(d)(1). *See* U.S.S.G. § 2B1.1 cmt. 10(A). Section 1028(d)(1) defines an "authentication feature" as

> any hologram, watermark, certification, symbol, *code*, image, *sequence of numbers* or letters, or other feature that either individually or in combination with another feature is used by the issuing authority on an identification document, document-making implement, or *means of identification* to determine if the document is counterfeit, altered, or otherwise falsified[.]

18 U.S.C. § 1028(d)(1) (emphasis added).

Second, the statute defines "means of identification" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual." *Id*. § 1028(d)(7). This includes a long list of standard "means of identification" such as social security

---

[1] Although Barrogo has now been released from prison, her counsel clarified at oral argument that the authentication feature issue is not moot because if it were resolved in Barrogo's favor, that could provide a basis for the district court to revisit Barrogo's supervised release.

and drivers' license numbers. *Id*. § 1028(d)(7)(A)–(C). But "means of identification" also includes any "*access device* (as defined in section 1029(e))." *Id*. § 1028(d)(7)(D) (emphasis added).

Lastly, an "access device" is then defined as

> any *card*, plate, code, *account number*, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, or other means of account access *that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value*, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument)[.]

*Id*. § 1029(e)(1) (emphasis added). Taken together, the statutory scheme thus defines "authentication feature" to mean certain qualifying features (such as letters, numbers, or symbols) used on a "means of identification," and an "access device" is such a "means of identification."

We interpret both statutes and the Sentencing Guidelines using traditional tools of statutory construction. *United States v. Cox*, 963 F.3d 915, 920 (9th Cir. 2020); *United States v. Valenzuela*, 495 F.3d 1127, 1133 (9th Cir. 2007). Although the interrelated provisions are here somewhat complex, lacing them together shows that the district court properly imposed the enhancement in Barrogo's case.

There is no question that a PIN satisfies the first part of the "authentication feature" definition: it is a "code" or "sequence of numbers." 18 U.S.C. § 1028(d)(1). Nor is it contested that the Guam DPHSS is an "issuing authority." *See id*. § 1028(d)(6)(A) (defining "issuing authority" as "any governmental entity or agency that is authorized to issue identification documents, means of identification, or authentication features"); *United States v. Kirilyuk*, 29 F.4th 1128, 1139 (9th Cir. 2022). Lastly, an EBT card is an "access device"—and therefore a "means of identification"—because it is a "card . . . that can be used . . . to obtain money, goods, services, or any other thing of value." 18 U.S.C. § 1029(e)(1). An EBT card is also associated with an account number, and that too is an "access device" as the statute defines it. *Id.*

We can now put the various pieces together. A PIN number (a "code" or "sequence of numbers") is an "authentication feature" because it is "used by the issuing authority [(DPHHS)] on . . . [a] means of identification"— the EBT card or account number, which are "access devices"— "to determine if the document is counterfeit, altered, or otherwise falsified." *See* 18 U.S.C. § 1028(d)(1). Put another way, a "sequence of numbers" that is "used by the issuing authority on . . . [a] means of identification"— such as a "card . . . that can be used . . . to obtain . . . any thing of value"—qualifies as an "authentication feature." *Id*. §§ 1028(d)(1), 1029(e)(1).

A possible source of ambiguity in this case is the requirement that the authentication feature—here, the PIN—be "used by the issuing authority *on* . . . [a] means of identification." *Id*. § 1028(d)(1) (emphasis added). Barrogo argues that a PIN does not count as an authentication feature because its numbers are not physically "on" the EBT card.

While this argument has some superficial appeal, it is not consistent with either the statutory text considered as a whole or our precedent.

A reading requiring the authentication feature to be physically "on . . . [a] means of identification" would be inconsistent with the plain language of § 1028(d)(7), which defines "means of identification." As we have noted, the statute defines "authentication feature" to include a sequence of numbers used on a "means of identification," the latter of which includes "access devices." *Id.* § 1028(d)(7)(D). And "access devices" is defined to include both physical elements, such as a "card" or "plate," and non-physical elements, such as a "code, account number, electronic serial number, mobile identification number, [or] personal identification number." *Id.* § 1029(e)(1).

The statute therefore contemplates someone using a non-physical "authentication feature," like a PIN, "on" a non-physical "means of identification," like an account number. *Id.* § 1028(d)(1). This reading is consistent with dictionary definitions of the word "on," which indicate that it can describe non-physical relations between subjects. *See, e.g.*, 10 Oxford English Dictionary 793 (2nd ed. 1989) (defining "on" as "[o]f local position outside of, but close to or near, any surface. Primarily of things physical, *but also of non-physical things treated as having extension*.") (emphasis added); American Heritage Dictionary 1263 (3rd ed. 1994) (noting that "on" can be "[u]sed to indicate [a] figurative or abstract position"). This definition of "on" is also consistent with common parlance, in which we regularly speak (for example) of the number or name "on" an account.

The statutory scheme therefore contemplates that an "authentication feature" need not be a physical thing affixed

to or imprinted on another physical thing because a "means of identification" need not itself be a physical thing. A non-physical association between the "authentication feature" and the "means of identification" can therefore be sufficient. The rest of the definition of "means of identification" supports this, as well. That definition includes types of personal identifying information—including "biometric data," such as voice or retina information, and "unique electronic identification number[s], address[es], or routing code[s]"—that are not necessarily tangible in nature, but which are nonetheless used "to identify a specific individual." 18 U.S.C. § 1028(d)(7)(B)–(C). Barrogo's reading of "on" would render various parts of the statutory definition non-operative.

The fact that certain authentication features, such as "hologram[s]" or "watermark[s]," must by their nature have some physical relationship with the means of identification does not change our analysis. 18 U.S.C. § 1028(d)(1). We do not "construe a statute by reading related clauses in isolation or taking parts of a whole statute out of their context." *Westwood Apex v. Contreras*, 644 F.3d 799, 804 (9th Cir. 2011). Because the statute here includes both physical and non-physical "means of identification," we think that the far more reasonable interpretation of "used . . . on" in § 1028(d)(1) includes the use of non-physical authentication features that are naturally associated with a physical or non-physical "means of identification." Here, that is a PIN "on" an account or associated card.

Our interpretation also finds considerable support in our leading precedent in this area, *United States v. Sardariani*, 754 F.3d 1118 (9th Cir. 2014). In that case, the defendant argued that the authentication feature enhancement did not apply to his use of forged notary seals and signatures on

deeds because the deeds themselves were not "identification documents." We rejected this argument, noting that "the statute does not require that an authentication feature appear on an identification document" but also encompasses features used "on . . . [a] *means of identification*." *Id.* at 1121 (quoting 18 U.S.C. § 1028(d)(1)). Since a signature is a "means of identification," we concluded that "the forged notary seals were used *on* a means of identification," without focusing on the exact physical relationship between the two. *Id.* at 1121–22 (emphasis added); *see also id.* at 1122 ("The notary seals were, therefore, authentication features *applied to* means of identification [(the signatures)].") (emphasis added). *Sardariani* is hard to square with Barrogo's more limited reading of "on . . . [a] means of identification" as meaning only a physical inscription on a physical document or device.

It is true, however, that § 1028(d)(1) does use the phrase "the document" in addition to "means of identification," stating that "authentication feature" means a qualifying feature (here a code or sequence of numbers) that "is used by the issuing authority on an identification document, document-making implement, or means of identification to determine if *the document* is counterfeit, altered, or otherwise falsified." The word "document" is not defined in the statute, but it is not limited to something like a piece of paper. Instead, "document" traditionally means "[s]omething tangible on which words, symbols, or marks are recorded." *Document*, Black's Law Dictionary (11th ed. 2019). That would of course include the prototypical identification "document": the government-issued ID. *See* 18 U.S.C. § 1028(d)(3) (defining "identification document"). We have no occasion to decide whether "the document" in § 1028(d)(1) should be limited to tangible

items (in context, the phrase "the document" appears to refer also to "means of identification," which, as have noted, are not necessarily tangible).  But for present purposes, it is sufficient to conclude that the EBT card is a tangible item on which information is recorded, and so clearly qualifies as a "document."

Barrogo makes one final argument.  Pointing out that the purpose of an "authentication feature" is "to determine if the document is counterfeit, altered, or otherwise falsified," *id*. § 1028(d)(1), Barrogo argues that the authentication feature enhancement should not apply to her because the EBT cards in this case were genuine.  In her view, the purpose of a PIN is not to establish that the card was authentic, but to prevent unauthorized persons from accessing SNAP benefits.

We find this argument unpersuasive.  Although Barrogo is of course correct that one purpose of a PIN is to prevent use of a card by an unauthorized person, a PIN also serves as a check against the counterfeiting, alteration, or falsification of the document itself.  A wrongdoer's inability to provide a PIN is, in other words, a way of "determin[ing] if the document is counterfeit, altered, or otherwise falsified."  *Id.*  And regardless, the phrase "otherwise falsified" broadens the reach of the provision beyond counterfeiting or formally altering a document.  Barrogo presented a "falsified" EBT card and PIN when she falsely represented herself as a SNAP beneficiary.  Someone who falsely signs a check purporting to represent the account holder falsifies the check.  Similarly, someone who falsely uses a PIN and EBT card to access SNAP benefits falsifies the "means of identification" and, here, the underlying request for government-subsidized food.  Barrogo thus falls within both the text and objective of the authentication feature enhancement.

In sum, the "authentication feature" here is the PIN (the "sequence of numbers") used by DPHSS (the "issuing authority") on the EBT card or account number ("access devices" that are a "means of identification") to determine if that EBT card ("the document") is counterfeit, altered, or otherwise falsified. That is a sensible reading of the statute, and one that gives the text its full effect. The district court therefore correctly imposed the two-level authentication feature enhancement.

III

We next consider whether the record adequately supports the district court's $18,752.30 restitution order. We review the legality of a restitution order de novo and related factual findings for clear error. *United States v. Kaplan*, 839 F.3d 795, 800 (9th Cir. 2016). We find no error in the restitution order.

The government requested $18,752.30 in restitution for the DPHSS. It calculated this amount based on $15,625 in trafficked benefits from Stephanie Muna, $21,317.67 from A.M. and J.D., and $561.93 from A.T. The total trafficked benefits amounted to $37,504.60. The government then sought restitution for half that amount, representing what it regarded as Barrogo's fair share of the liability.

Barrogo conceded that she was responsible for the SNAP benefits trafficked with Muna and A.T., totaling $16,186. But she argued that the government did not sufficiently prove that she was responsible for the $21,317.67 in benefits trafficked with A.M. and J.D. Though she admits to having made improper transactions with these individuals, she claimed that the total amount of trafficked benefits was lower than what the government claimed.

In ordering restitution, a district court must comply with the procedures in 18 U.S.C. § 3664, which require the court to resolve "[a]ny dispute as to the proper amount . . . of restitution . . . by the preponderance of the evidence." *Id.* § 3664(e).      The government bears the "burden of demonstrating the amount of the loss sustained by a victim." *Id*.  We have previously held that "§ 3664(e) requires both that a district court set forth its reasons in resolving a dispute over restitution and that a restitution award, if one issues, be adequately supported by evidence in the record." *United States v. Tsosie*, 639 F.3d 1213, 1222 (9th Cir. 2011).  At the same time, "district courts possess 'a degree of flexibility in accounting for a victim's complete losses.'" *Id.* at 1223 (quoting *United States v. Waknine*, 543 F.3d 546, 557 (9th Cir. 2008)).

The district court satisfied its responsibilities here.  The court held a hearing devoted to restitution, at which it played an active role.  At the hearing, the district court heard testimony from Ruben Carandang, an investigator with the DPHSS Division of Public Welfare.  Carandang testified that SNAP purchases are maintained as records, and that his office calculated the amount of SNAP benefits trafficked with A.M. and J.D. based on receipts from their EBT purchases from 2018 to 2020.  Using these receipts, investigators looked for large "repeated[]" bulk purchases of items that Barrogo was known to use in her restaurant, such as sacks of rice, frozen meats, vegetables, lumpia wrappers, and certain spices.  Carandang further explained that A.M. and J.D. were purchasing the same bulk items "2 to 3 times in a month," which is "very unusual" and not consistent with "consumption [for] the household."

In addition to the receipts, Carandang testified that his office had a photo of A.M. and J.D. delivering carrots to

Barrogo's restaurant and video surveillance footage of the two purchasing bulk items. Carandang's office had also found a photo of a whole pig on Barrogo's Facebook page that coincided in time with A.M. or J.D. using SNAP benefits to purchase a whole pig. Despite Barrogo's objections, the district court determined that Carandang was "an incredibly solid" and "very credible" witness, and that the government had proven its requested restitution amount by a preponderance of the evidence.

Barrogo has not demonstrated error in the district court's determination, and her various arguments are either speculative, overstated, or effectively assume that the government and the district court were required to meet heightened standards of proof that our law does not impose in this context. Here, a "very credible" investigator explained his method of calculation, which was based on receipts and other evidence, in the context of a case in which the defendant admitted her wrongdoing. This was sufficient. And Barrogo's argument that the restitution order was improper because it was not proven to a jury beyond a reasonable doubt is foreclosed by our precedent. *See United States v. Green*, 722 F.3d 1146, 1149 (9th Cir. 2013). Accordingly, we uphold the district court's order requiring Barrogo to pay $18,752.30 in restitution.**[2]**

---

[2] We also reject Barrogo's argument that the government's breach of the plea agreement constituted plain error, requiring resentencing. Although the government concedes that it erroneously recommended two years of supervised release when it had agreed to recommend just one, Barrogo did not object below and there is not "a reasonable probability that the error affected the outcome" of the proceedings. *United States v. Marcus*, 560 U.S. 258, 262 (2010). The district court did not accept the government's recommendation of two years' supervised release, and

\*      \*      \*

For the foregoing reasons, the judgment of the district court is

**AFFIRMED.**

---

instead went with three years. The district court had elsewhere commented on the severity of Barrogo's conduct and the fact that she persisted in it even after DPHSS began investigating her. We conclude that "[t]he record establishes that the district court conducted its own independent evaluation of the propriety of the stipulated sentence." *United States v. Gonzalez-Aguilar*, 718 F.3d 1185, 1187 (9th Cir. 2013). There is no non-speculative basis to conclude that the government's breach of the plea agreement affected the district court's sentencing decision. *See id.* at 1189 ("Mere 'possibility' is insufficient to establish prejudice.").